FILED
United States Court of Appeals
Tenth Circuit

October 21, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

GLENN WEIGEL and DAVID WEIGEL,
individually and as co-personal representatives
of the ESTATE OF BRUCE JAMES WEIGEL,
Deceased,

      Plaintiffs-Appellants/Cross-Appellees,

v.

JOHN K. BROAD, individually; and DEVAN
HENDERSON, individually,

      Defendants-Appellees/Cross-Appellants.

THE WYOMING HIGHWAY PATROL;
COLONEL JOHN COX, individually and in his
official capacity; and JOHN DOES I-X,
individually and in their official capacities,

      Defendants.

Nos. 05-8094
05-8102

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 04-CV-355-J)**

---

Larissa A. McCalla, The Spence Law Firm, LLC, Jackson, Wyoming (G. Bryan
Ulmer III, Lawyers & Advocates for Wyoming, Jackson, Wyoming, with her on
the briefs), for Plaintiffs-Appellants/Cross-Appellees.

Christine Cox, Assistant Attorney General (Patrick J. Crank, Wyoming Attorney
General, and John W. Renneisen, Deputy Attorney General, with her on the

briefs), State of Wyoming, Cheyenne, Wyoming, for Defendants-Appellees/Cross-Appellants.

Before **HARTZ**, **SEYMOUR**, and **O'BRIEN**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Plaintiffs Glenn Weigel and David Weigel filed this action against Wyoming Highway Patrol Officers John K. Broad and Devan Henderson, and their supervisor, John Cox, individually. Plaintiffs make claims of failure to train and excessive force under 42 U.S.C. § 1983 and state negligence law. The claims stem from the death of their brother, Bruce Weigel, who died after an altercation with Troopers Broad and Henderson. Defendants moved for summary judgment, asserting qualified immunity. In concluding defendants were immune from suit, the district court held that while plaintiffs could show defendants violated Mr. Weigel's Fourth Amendment right to be free from unreasonable search and seizure, they could not show the troopers' conduct was objectively unreasonable in light of clearly established law. The court therefore granted defendants' motion for summary judgment. Because the standard for qualified immunity under Wyoming law is less stringent, the court denied defendants' motion for summary judgment as to the state law claims. The court certified the § 1983 claims for interlocutory appeal pursuant to Federal Rules of Civil Procedure

54(b), and stayed the matter pending appeal. We construe the court's certification order to only permit an appeal from the summary judgment entered on the § 1983 claims brought against Officers Henderson and Broad and our reference to defendants in this opinion refers only to them. On appeal, plaintiffs argue the district court wrongly decided the second prong of the qualified immunity test. Defendants cross-appeal, contending the court incorrectly decided the first prong of the qualified immunity test.

We take jurisdiction pursuant to 28 U.S.C. § 1291 and reverse the district court's grant of summary judgment as to plaintiffs' § 1983 claims because we conclude there are questions of fact as to the applicability of qualified immunity.

# I

"In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party, as is appropriate when reviewing a grant of summary judgment." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1201 n.1 (10th Cir. 2006) (citing FED. R. CIV. P. 56(c)).

On the morning of December 20, 2002, Wyoming Highway Patrol Troopers Broad and Henderson were both en route to the Wyoming port-of-entry on Interstate 25. In order to reach the port, the troopers exited I-25 southbound and turned around in the median to enter I-25 northbound. Trooper Broad entered I-25 northbound first, followed by Trooper Henderson. Just after Trooper

-3-

Henderson entered the highway, Bruce Weigel struck Trooper Broad's car from behind. After the collision, Mr. Weigel's car careened through the median strip and re-entered I-25 south. Mr. Weigel's vehicle came to a rest on the left shoulder of the I-25 southbound lanes. Trooper Broad's vehicle stopped on the left shoulder of I-25 northbound, and Trooper Henderson pulled over to the right shoulder of I-25 northbound.

Trooper Broad radioed to dispatch that there had been an accident. Records indicate that call was made at 7:50 a.m. Trooper Broad approached Mr. Weigel's vehicle on foot to assess Mr. Weigel's injuries, if any. Mr. Weigel denied the need for an ambulance. Because it was department policy to notify a supervisor when an officer was involved in a crash, Trooper Broad radioed for his patrol supervisor. Troopers cannot work a crash in which they are involved, so Trooper Henderson agreed to be responsible for making the accident report.

While the report was being made, both Troopers Broad and Henderson asked Mr. Weigel about the cause of the accident. Mr. Weigel said he believed his vehicle's steering linkage had come loose or broken. Trooper Henderson then asked Mr. Weigel to produce his driver's license, vehicle registration, and insurance, but he was only able to produce his vehicle registration and insurance. While speaking with Mr. Weigel, Trooper Henderson smelled alcohol on his breath. Trooper Broad agreed Mr. Weigel's breath smelled of alcohol. Believing Mr. Weigel's possible inebriation may have contributed to the accident, Trooper

-4-

Henderson asked Mr. Weigel if he would submit to a field sobriety test and he agreed to do so. Mr. Weigel and Trooper Henderson then approached the interstate to return to Trooper Henderson's patrol car. Trooper Henderson "noticed a van coming toward [them]. [He] told the subject to wait before crossing the Interstate or he would get hit. [Mr. Weigel] looked at [him] [and] continued to walk across the Interstate. [He] then told [Mr. Weigel] once again to get back where [he] was and stay out of traffic. [Mr. Weigel] took a few steps back toward him, looked at him, [and] then looked at the van [and] ran straight out in front of the van." Aplt. App., vol. II at 333-34. Mr. Weigel was struck in the chest by the sideview mirror of the passing van. Seeing that Mr. Weigel was hit, Trooper Broad radioed for an ambulance. Records indicate this call was made at 7:54 a.m. Mr. Weigel continued his attempt to cross the interstate despite the blow. When Mr. Weigel fled, Trooper Henderson thought "he [was] trying to commit suicide because the van [was] right there and me and him [could] both see it." *Id.* at 396. Other witnesses generally described Mr. Weigel's behavior as "strange," "bizarre," "odd," *id*. at 619, "not normal," *id*. at 652, and "erratic." *Id.* at 638.

Concerned for the safety of Mr. Weigel and the public, Trooper Henderson followed Mr. Weigel, tackled him, and wrestled him to the ground in a ditch alongside the highway. A further struggle ensued, involving Mr. Weigel, Trooper Henderson, Trooper Broad, and, eventually, bystanders. Accounts of the struggle

-5-

are conflicting, but it is generally agreed that Mr. Weigel fought vigorously, attempting repeatedly to take the troopers' weapons and evade handcuffing.

In the midst of the melee, Trooper Henderson put Mr. Weigel in a choke hold. Although Trooper Broad then got ahold of one of Mr. Weigel's arms, *id.* at 336, Mr. Weigel continued to resist and fight. At that point, the troopers solicited assistance from bystanders gathered near Mr. Weigel's vehicle. Responding to the call for help, Dana Stickley grabbed a downed fencepost and headed across the interstate to assist the officers. Because Trooper Broad had secured the second handcuff just as Mr. Stickley arrived, he did not club Mr. Weigel with the fencepost. *Id.* at 355. Even handcuffed, Mr. Weigel continued to struggle, so Mr. Stickley lay across the back of Mr. Weigel's legs. The troopers maintained Mr. Weigel in a facedown position. Trooper Broad applied pressure to Mr. Weigel's upper body, including his neck and shoulders, by using either one or both knees and his hands. *See id.* at 379 ("But I do not know if I had – I'm unsure whether or not I had one or two knees on him."). Trooper Henderson straddled Mr. Weigel's upper thighs and buttocks and held Mr. Weigel's arms in place. At some point, another bystander began binding Mr. Weigel's feet with plastic tubing or cord found in his vehicle, while Mr. Stickley remained on Mr. Weigel's legs. With Trooper Broad positioned on Mr. Weigel's upper torso, Mr. Stickley positioned on top of Mr. Weigel's legs, Mr. Weigel's hands cuffed and his feet

bound or being bound,[1] Trooper Henderson went to his vehicle to warm his hands. Mr. Stickley stayed on Mr. Weigel's legs until it was determined Mr. Weigel was in cardiac arrest. Aplt. App., vol. III at 645.

In his initial report to a police investigator, Trooper Henderson indicated that Mr. Weigel was subdued before he left him. "Trooper Henderson said the driver was laying on his stomach with his head turned to the side, legs straight out and just quit struggling . . . . Trooper Henderson went to his patrol vehicle to radio for additional assistance and obtain his coat and gloves."[2] *Id.*, vol. II at 340-41. In his deposition account of the event, Trooper Henderson testified he would not have returned to his vehicle "[i]f Mr. Weigel posed a safety risk to the safety of [him] or the other witnesses standing around or Trooper Broad." *Id.* at 406. He further stated he "felt confident with the witnesses around [Mr. Weigel] that if the suspect tried to get up that they would keep him down . . ." *Id.* at 425.

---

[1]Trooper Henderson offered contradictory testimony as to when Mr. Weigel's feet were bound. When first asked, he said that they were bound when he went to his patrol car. Aplt. App., vol II. at 404. He later said he did not remember if Mr. Weigel's feet were tied when he left the immediate scene but he "noticed that they were tied" when he returned. *Id.* at 406.

[2]The dissent maintains that during the time Trooper Henderson returned to his vehicle "Weigel continued to struggle," dissent at 6. Trooper Henderson's own statement to the police investigator belies this assertion. The dissent maintains this contradictory statement cannot create a genuine issue of material fact as to when Mr. Weigel quit struggling because it is hearsay. Dissent at 18-19 n. 15. However, under Federal Rule of Evidence 801(d)(2)(A), Henderson's statement is an admission of a party opponent and is therefore not hearsay. *See Plotke v. White*, 405 F.3d 1092, 1094 & n. 1 (10th Cir. 2005).

-7-

When Trooper Broad was asked in his deposition, "[D]id you feel comfortable that you could control [Mr. Weigel] without Mr. Henderson," he replied, "I think I did with the witnesses still holding down his lower body." *Id.* at 358.

One witness testified that Mr. Weigel ceased to struggle at one or two points throughout the event. *See id.*, vol. III at 618 ("[T]here was one, what I recall sort of a major time when [Mr. Weigel] quit struggling and then the situation seemed to be completely [diffused], . . . and then he started to try to get up and move around again, and that's when the officer said don't struggle, don't get up.") The witness viewed the situation as under control when Trooper Henderson went back to his car. *Id.* at 620. When Trooper Broad was asked how long Mr. Weigel struggled before he completely stopped, he responded: "Oh, after he was handcuffed? I don't know. A minute, minute and a half." *Id.* at 358.

Trooper Henderson estimated his vehicle was approximately twenty feet from Mr. Weigel, Trooper Broad, and Mr. Stickley. While in the car, Trooper Henderson shut the door, turned on his heater, and warmed his hands. One witness testified Trooper Henderson made a radio call while in his vehicle. While dispatch records show a person at the scene radioed dispatch at 7:57 a.m. with information that the struggle had subsided, Trooper Henderson does not remember making this call. When Trooper Henderson returned to the immediate scene, Trooper Broad told him he believed Mr. Weigel had stopped breathing. The Troopers rolled Mr. Weigel on to his back and determined that he was in full

cardiac arrest. A call to dispatch reporting this was made at approximately 8:00 a.m. Resuscitation began after a CPR mask was located, but the attempts to resuscitate Mr. Weigel were unsuccessful. The autopsy revealed the most likely cause of Mr. Weigel's death was "mechanical asphyxiation caused by inhibition of respiration by weight applied to the upper back." Aplt. App., vol. I at 185; vol. II at 472.

The risk of such asphyxiation should have been familiar to Troopers Broad and Henderson. Numerous training materials provided to the troopers addressed the risks of putting weight on an individual's back when the person is lying on his stomach. During the troopers use-of-force training at the Wyoming Law Enforcement Academy (WLEA), they were provided with extensive written materials, oral lectures, and audiovisual presentations regarding the dangers of Sudden Custody Death Syndrome and positional asphyxiation. Aplt. App., vol. I at 109-29. These documents discuss the phenomenon of sudden custody death and provide direction in avoiding the death of an arrestee. The materials repeatedly warn that putting weight on the upper torso of a person may cause positional asphyxiation. For example, one document provides the following two relevant guidelines for preventing deaths in custody: "[1)] As soon as the subject is handcuffed, get him off his stomach. Turn him on his side or place him in a seated position. [2)] If he continues to struggle, do not sit on his back. Hold his legs down or wrap his legs with a strap." *Id.* at 111.

Another training document provided to the troopers regarding sudden in-custody death discusses the extra care that should be taken with detainees who have special needs. *Id.* at 128. "Special needs" prisoners are those that "violently resist arrest or try to assault officers, . . . are impaired by alcohol or other drugs, . . . breathe and sweat heavily and exhibit a pallid skin, . . . are engaged in incoherent and irrational conduct or speech, . . . [or] are overly obese and who are known to have a medical condition." *Id.* Troopers Broad and Henderson also viewed a powerpoint presentation on in-custody deaths. *Id.* at 194. One slide explained that in-custody deaths "tend to share elements which occur in a basic sequence: subjects display bizarre or frenzied behavior[;] almost always, subjects are intoxicated by drugs and/or alcohol[;] [there is a] violent struggle with police[;] and police use force and employ a type of restraint." *Id.* Informing on the "do's and don'ts [of] positional asphyxia," the slides stated, "[a]s much as possible, AND AS SOON AS POSSIBLE, relieve the subject of heavy weight used for control[;] Don't misinterpret a suspect's struggle for oxygen as continued resistance[; and] [a]s soon as possible get the person out of the prone position, on his/her side, or seated in [an] upright position[.]" *Id*. at 197.

The troopers also viewed a training video on avoiding the risks associated with positional asphyxiation. The video described the physiology of breathing and explained what happens when weight is placed on the back of a person in a

prone position. The video admonishes law enforcement to be aware of the risks of weight applied to the back of a prone suspect and instructs them to roll a suspect off of his stomach and onto his side as soon as he is cuffed. Aplt. App, vol. III at 518. The demonstration of what to do once a person is subdued is precise: get the person off of his belly.

Finally, the troopers testified they had an understanding of the cause of positional asphyxiation. For example, when asked of his understanding of the term positional asphyxiation, Trooper Broad stated, it "is basically when somebody's face down and—and pressure is applied to their—back or their upper body, upper torso and it basically restricts them from breathing." Aplt. App., vol. II at 365.

## II

We review *de novo* the district court's grant of summary judgment based on qualified immunity, applying the same legal standard used by the district court. *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir.1997). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV .P. 56(c). "We view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Lawmaster*, 125 F.3d at 1346.

Qualified immunity is an affirmative defense to an excessive force claim.

The doctrine of "[q]ualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms." *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004). When a defendant raises the qualified immunity defense on summary judgment, plaintiff must first "demonstrate that the defendant's actions violated a constitutional or statutory right." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quotation omitted). "[A]fter identifying the constitutional right[s] allegedly violated, courts must determine whether the conduct was objectively reasonable in light of clearly established law at the time it took place." *Pierce*, 359 F.3d at 1297. As articulated by the Supreme Court, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out *on a favorable view of the parties' submissions*, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (emphasis added).

### *Constitutional Violation*

Following *Saucier*, we first determine on the facts offered in support of plaintiffs' claim whether Troopers Broad and Henderson violated the

-12-

constitutional prohibition against the use of excessive force.[3]  Like the district court, we conclude they did.

"*[A]ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1187-88 (10th Cir. 2001).  The "inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation."  *Graham*, 490 U.S. at 388.  Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors:

---

[3]In defendants' cross-appeal, they assert the district court erred in holding that the troopers "unreasonably applied excessive force, in violation of the Fourth Amendment."  Aplt. App., vol. III at 718.  Plaintiffs contend we have no jurisdiction over the cross-appeal, arguing the district court only certified for appeal the issue of whether a lack of clearly established law shielded defendants from suit.  We disagree.  Although Rule 54(b) permits only those claims which the district court has declared final to be appealed separately, the rule provides for appeal of an entire claim, not certain issues within a claim.  *See* FED. R. CIV. P. 54(b) (court may direct entry of "a final judgment as to one or more . . . claims").  In granting plaintiffs permission to appeal interlocutorily, the district court necessarily certified for appeal plaintiffs' entire § 1983 claim, the validity of which is part of the qualified immunity analysis.  Defendants' cross-appeal is thus better characterized as simply an argument urging us to affirm the district court's decision; in effect, defendants contend the district court reached the right decision for the wrong reason.

"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Additionally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* That perspective includes an "examination of the information possessed by the [officers]." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

"Where [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003). Here, plaintiffs assert that after the threat of serious physical harm had passed, the troopers' application of weight to Mr. Weigel's upper torso was constitutionally unreasonable. The district court concluded as follows:

> As alleged, [Mr.] Weigel was in custody at the time of his death. [Mr.] Weigel's death arguably came as a result of the pressure that was applied to his upper torso after he was subdued, and no longer a threat. He was in a prone position, and handcuffed. Indeed some evidence suggests that his legs were bound together. The evidence also suggests that the encounter had become stabilized to the point that one of the Troopers left [Mr.] Weigel and went to his vehicle to warm his hands—it is easily inferred that Trooper Henderson would not have left Trooper Broad had he thought [Mr.] Weigel still posed a credible threat to his safety. . . . An objectively reasonable police officer . . . would not have continued to apply pressure to [Mr.] Weigel's upper torso, thereby denying him oxygen, after [Mr.] Weigel was subdued and no longer a threat.

-14-

Aplt. App., vol. III at 718.

A review of the facts in the light most favorable to plaintiffs persuades us they give rise to a jury question regarding whether the officers acted reasonably. First, there is evidence a reasonable officer would have known that the pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death. His apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation. *See Cruz v. City of Laramie*, 239 F.3d 1183, 1188-89 (10th Cir. 2001) (agitated state constituted a clue to trained officer that pressure on the chest was likely to cause positional asphyxia). And WLEA training materials made clear that the pressure applied to Mr. Weigel's upper torso would suffice to cause his suffocation.

Second, there is evidence that Mr. Weigel was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him. The defendants make no claim that once Mr. Weigel was handcuffed and his legs were bound, he still would pose a threat to the officers, the public, or himself unless he was maintained on his stomach with pressure imposed on his upper back. Yet there was evidence that when Trooper Henderson returned to his vehicle to warm his hands, Mr. Weigel was handcuffed, his feet were bound, and Mr. Stickley was lying across his legs. *See, e.g., Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (officer's departure from struggle raised question of fact as to degree of control over subject after he was cuffed.). There

-15-

is also evidence that Mr. Weigel was maintained in that position for about three minutes: the time it took Trooper Henderson to walk to his vehicle, call the dispatcher to report that Mr. Weigel was under control, warm his hands, and return to Mr. Weigel. Making a reasonable inference that Trooper Henderson promptly called the dispatcher to report on Mr. Weigel's condition, the time between Trooper Henderson's two calls (three minutes) would be about the same as the length of time that Mr. Weigel was held on his stomach with his legs restrained, his hands cuffed, and his upper back held down by pressure from Trooper Broad.[4]

---

[4]Trooper Henderson makes no argument that his liability should be addressed differently than that of Trooper Broad because he was in his car when Mr. Weigel went into cardiac arrest. Moreover, as we recently recognized in *Vondrak v. City of Las Cruces*, 535 F.3d 1198, (10th Cir. 2008), it is clearly established

> that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Id.* at __, 2008 WL 2967656 at 10 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)) (citations omitted); *see also Mick v. Brewer*, 76 F.3d 1127, 1136

(continued...)

-16-

In short, there is evidence that for three minutes the troopers subjected Mr.

Weigel to force that they knew was unnecessary to restrain him and that a

reasonable officer would have known presented a significant danger of

asphyxiation and death. If true, this constitutes an unreasonable use of force

under the Fourth Amendment. *See Gutierrez v. City of San Antonio*, 139 F.3d

441, 449 (5th Cir. 1998) ("material dispute of fact exists as to whether Gutierrez

posed a threat of death or serious bodily injury to the officers or to others," in

hog-tying excessive force case).

### *Clearly Established Law*

The district court also held that defendants violated Mr. Weigel's Fourth

Amendment rights. But the court relieved them of liability on the ground that the

law they violated was not clearly established at the time of the incident. We

disagree.

The question before us is whether the violation involved a clearly

established right about which a reasonable person would have known.

> "Ordinarily, in order for the law to be clearly established, there must
> be a Supreme Court or Tenth Circuit decision on point, or the clearly
> established weight of authority from other courts must have found
> the law to be as the plaintiff maintains." The plaintiff is not required
> to show, however, that the very act in question previously was held

---

[4](...continued)
(10th Cir. 1996).

-17-

unlawful in order to establish an absence of qualified immunity. *Cruz*, 239 F.3d at 1187 (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) (footnote omitted).

The district court compared the facts of *Cruz*, where the decedent was hog-tied, to the facts of this case and concluded there was no clearly established law prohibiting the troopers' actions because of the dissimilarity between the factual scenarios. In *Cruz*, Wyoming police officers responded to a complaint of a naked man running on the exterior landing of an apartment building. *Id.* at 1186. When the officers arrived, Mr. Cruz, the man on the landing, was jumping up and down and kicking his legs in the air. When he descended from the landing, the officers wrestled him to the ground and handcuffed him. They applied a nylon restraint to his ankles to abate his continued struggle. Then a metal clip was used to fasten the wrist and ankle restraints together, a restraint technique known as hog-tying. Shortly thereafter, Mr. Cruz's face blanched. He was rushed to the hospital, where he was pronounced dead on arrival. Expert reports indicated that Mr. Cruz's death resulted from positional asphyxiation.

Although we held there was not clearly established law prohibiting the officers' actions at the time they encountered Mr. Cruz, we also made clear that similar future conduct was prohibited. Specifically, we stated, "officers may not apply th[e hog-tie] technique when an individual's diminished capacity is apparent." *Id.* at 1188. To reach this conclusion, we not only evaluated hog-

-18-

tying cases and the risks of that technique, we also generally discussed the known dangers of "sudden custody death syndrome." *Id.* at 1189. We made specific note of "the relationship between improper restraints and positional asphyxiation." *Id.* In particular, we highlighted the "breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of 'excited delirium.' These breathing problems lead to asphyxiation." *Id.*

The district court believed that the type of restraint used in *Cruz* was sufficiently different from that employed on Mr. Weigel that *Cruz* did not clearly establish the unconstitutionality of defendants' alleged actions. But our analysis in this case of the constitutionality of the restraint of Mr. Weigel does not require us to compare the facts of *Cruz* to the allegations here. It is based on more general principles. The Fourth Amendment prohibits unreasonable seizures. We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself. Yet, as explained above, there is evidence that this is what happened here: even after it was readily apparent for a significant period of time (several minutes) that Mr. Weigel was fully restrained and posed no danger, the defendants continued to use pressure on a vulnerable person's upper torso while he was lying on his stomach. A reasonable officer would know these actions present a substantial and totally

-19-

unnecessary risk of death to the person. As the Supreme Court has stated:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations and internal quotations omitted).

*Cruz* turns out to be highly relevant to this case, but not for its legal teaching. Rather, the opinion was apparently the reason for the extensive WLEA training on positional asphyxia that we describe above. The troopers' training instructor, Trooper Terry Vincent, testified he received a memorandum, distributed state wide, discussing the *Cruz* decision. Aplt. App., vol. II at 484. Trooper Henderson recalled Trooper Vincent posting "some case law in our office" regarding hog-tying or positional asphyxiation called "*Cruz* versus Wyoming or something like that." *Id.* at 418. Trooper Broad testified he vaguely remembered the decision in *Cruz* and understood it to be the reason that the Wyoming Highway Patrol was prohibited from hog-tying detainees. *Id.* at 367.

If *Cruz* had not been handed down, perhaps Wyoming troopers would not have received training on positional asphyxia and would be uninformed about the danger. But the reasonableness of an officer's actions must be assessed in light of the officer's training. The defendants' training informed them that the force they

used upon Mr. Weigel produced a substantial risk of death. Because it is clearly established law that deadly force cannot be used when it is unnecessary to restrain a suspect or secure the safety of officers, the public, or the suspect himself, the defendants' unnecessary use of deadly force violated clearly established law.

We recognize the events leading up to Mr. Weigel's death happened quickly. We further acknowledge that, up to a point, the troopers were protecting themselves and the public from Mr. Weigel and Mr. Weigel from himself. But we are not addressing split second decisions by law enforcement officers to protect themselves and the public. Nor are we stating that the troopers necessarily acted unreasonably. If, however, the facts plaintiffs proffered are true and the jury draws the inferences most supportive of plaintiffs' position, then the law was clearly established that applying pressure to Mr. Weigel's upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions. We said this overtly, if not by strong and deducible inference, in *Cruz*. Moreover, cases from other circuits have stated it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004). *See also Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1061-62 (9th Cir. 2003); *Gutierrez*, 139 F.3d at 450-51. In these

-21-

circumstances, defendants are not entitled to qualified immunity at this stage of the proceedings.

Accordingly, we **REVERSE** the district court's order dismissing plaintiffs' § 1983 claims against the troopers on the basis of qualified immunity, and we **REMAND** for further proceedings.

05-8094, 05-8102 - *Weigel v. Wyoming Highway Patrol*

**HARTZ**, Circuit Judge, concurring:

I concur in the result and all of Judge Seymour's opinion except on one point. I do not think that the defendants violated Mr. Weigel's constitutional rights before his legs were bound. In light of Mr. Weigel's strength and previous behavior, it was not, in my view, unreasonable of the officers to keep him in a prone position with weight on his upper back so long as the only restraint on his legs was the weight of a bystander sitting on them. Nevertheless, Trooper Henderson initially testified that Mr. Weigel's feet were bound when he went to his patrol car; and a jury could find that Trooper Broad applied pressure to Mr. Weigel's upper back for as much as three minutes after his feet were bound. That finding would support a verdict that Mr. Weigel was subjected to unconstitutional force.

05-8094 & 05-8102 *Weigel v. Broad, et. al.*

J. **O'BRIEN**, dissenting.

The majority announces a very general rule—troopers may not subject a detained person to prolonged force beyond that necessary to restrain him if a reasonable trooper would have known the applied force presented a significant danger of asphyxiation and death.  It sounds remarkably like generic tort law—"[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm."  RESTATEMENT (SECOND) OF TORTS § 282.  It leaves the details to be sorted out after the fact by a jury in an appropriate case.  But an undifferentiated analysis of the facts should not force a barely plausible case to go to trial.  The district court correctly concluded the law relating to positional restraint was not clearly established as relevant to these facts, but it was first required by *Saucier*[1] to confront and decide the constitutional issue.  It did so, but incorrectly in my view.  The majority follows the same order of analysis and so shall I.

Reasonableness analysis compares threats and responses.  Unless all of the circumstances of the case are considered as a unitary whole the analysis fails.  Generalizations do little to inform the debate; focused and particularized attention to the facts is required.  This incident was short (slightly more than ten minutes)

---

[1] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

and intense (almost from its inception the troopers were fighting with Weigel and for a significant time literally fighting for their lives). Weigel's acts, not those of these troopers, escalated the violence to an extremely dangerous level. His behavior fully justified the restraints employed as well as their duration. As the fighting subsided the troopers continued to forcibly restrain (and monitor) the handcuffed but still fighting Weigel for less than three minutes. The full extent of the admittedly necessary positional restraints continued for only ten or fifteen seconds after Weigel was actually subdued and no longer a threat. I am unwilling to say the techniques employed here in the waning moments of a desperate fight were unreasonable, even though they resulted in Weigel's death.

I respectfully dissent from all aspects of the majority opinion. I would reverse the district court's conclusion that a constitutional violation occurred. In the alternative the troopers are entitled to qualified immunity (as the district court concluded).

"As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Incompetence or a knowing violation of law is a tough case to make and it hasn't been made here.[2]

---

[2] "Although actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties." *Medina v. Cram*, 252 F.3d

(continued...)

"The entitlement [to qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Immunity principles can only be served by a wholesome application of the trial judge's gatekeeping responsibility at the summary judgment stage.[3] The first step is to distill the record to uncontested facts and contested material facts favorable to the party claiming injury. *See* Fed. R. Civ. P. 56(c). But only *genuine* issues of contested *material* fact are entitled to favored status. *Scott v. Harris*, – U.S.–, 127 S. Ct. 1769, 1776 (2007). The next step is to examine the distillate—a case may proceed to trial only if the distilled facts demonstrate (1) a violation of a constitutional right and (2) the violation has been clearly established as a constitutional violation. *Saucier*, 533 U.S. at 201 (2001). "Where the record taken as a whole could not lead a rational trier of fact

---

[2](...continued)
1124, 1127 (10th Cir. 2001).

[3] Gatekeeping responsibilities are always present, but they vary, tone and tint. A motion to dismiss, for example, tests the sufficiency of pleadings. But constrained only by Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927, clever pleading is usually sufficient to pass that bar. Summary judgment, on the other hand, tests facts, which are less malleable than allegations. Enter the expert. A smorgasbord of experts with opinions to support almost any theory is now available. The creative use of experts prompted restraints on their testimony, superintended by the trial judge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Rigorous qualified immunity analysis, like other gatekeeping functions, helps insure rational decisions based upon the rule of law.

to find for the [party claiming injury], there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations omitted). "[M]etaphysical doubt as to the material facts" is not enough. *Id.* at 586.

The denial of a meritorious motion for summary judgment is inappropriate; as much so as summary judgment improvidently granted. To that end, we must look at the undisputed facts as they might reasonably appear to the troopers in this very brief and violent encounter. "'[I]f officers of reasonable competence could disagree' about the lawfulness of the challenged conduct, . . . 'qualified immunity should be recognized.'" *Gomes v. Wood*, 451 F.3d 1122, 1136 (10th Cir. 2006) (quoting *Malley*, 475 U.S. at 341).

## I. Factual Background

The facts laid out by the majority are accurate as far as they go. But the case is better understood when enriched with other undisputed facts.

When Henderson was chasing Weigel across northbound I-25, he saw two tractor trailer trucks approaching. As he described it at his deposition: "At that point I start chasing after [Weigel] in foot pursuit. And I notice that there [are] two tractor-trailers taking up both lanes of I-25 northbound headed straight for us . . . . I was scared that these tractors were going to hit both of us." (R. Vol. II at 396.) In pushing Weigel out of the way of the trucks, Henderson tore the knee out of his pants and took a "chunk out of [his] hand." (R. Vol. II at 398.)

When Henderson tackled Weigel, they landed on the east side of northbound I-25; Weigel got on top of Henderson and immediately attempted to take his weapon. Weigel unsnapped the holster, placed his hands around the gun and started to pull it out of the holster. When Henderson responded by pushing the gun back into the holster, Weigel grabbed Henderson's fingers and tried to pry them from the gun. Broad then tackled Weigel. Weigel immediately reached for Broad's weapon, getting a hand on it. Broad responded by pressing down on his gun "as hard as [he] could" with both hands. (R. Vol. II at 352.) Although the troopers outnumbered Weigel they called for help. Two bystanders heard the request. One was reluctant to assist after hearing one of the troopers yell "[h]e's trying to get my gun." (R. Vol. III at 614.) A more intrepid soul, Stickley (bless his heart), describing the situation as "[l]ike All Star Wrestling," ran over to assist, bringing a downed fence post as a weapon. (R. Vol. III at 644.) The driver of the minivan whose passenger mirror struck Weigel asked his wife's advice. She responded, "No way. You stay here," because she felt it was not safe. (R. Vol. III at 635.)

Weigel was extremely strong; Stickley described Weigel as having "superhuman strength." (R. Vol. III at 652.) Henderson believed Weigel was "stronger than anybody [he had] ever wrestled around with."[4] (R. Vol. II at 400.) After cuffing Weigel, both troopers were exhausted; Henderson was "nauseous"

---

[4] Henderson was a high school wrestler.

from overexertion. (R. Vol. II at 408.) Even after being handcuffed, Weigel continued to struggle—leading another witness, Winters, to tie (or attempt to tie) his feet together. With Weigel positioned on his stomach, his hands and feet restrained, Broad held down Weigel's upper body with his hands and/or knees, Henderson straddled Weigel's buttocks and Stickley was on his legs. In spite of those restraints Weigel still managed to pinch Henderson's inner thighs and groin area.

During Henderson's trip to his patrol car Broad continued to restrain the handcuffed Weigel, applying pressure to Weigel's upper torso; Weigel's feet were being held down by Stickley. In spite of the restraints, Weigel continued to struggle and fight. Eventually his feet were either tied or wrapped. Ten to fifteen seconds after Weigel's feet were bound,[5] Broad noticed Weigel had quit breathing.

When Henderson returned to the immediate scene[6] Broad told him Weigel had stopped breathing. The troopers initially believed he was faking. When (after a few seconds) they rolled Weigel onto his back, he let out a large exhale,

---

[5]Because the record is arguably debatable (*see* discussion, *infra* at 9-13) about whether Weigel's feet were actually tied or merely wrapped with a cord, I use the term "bound." In any event, his feet were only bound for fifteen seconds before he stopped breathing.

[6] Henderson and Broad both said Henderson was only gone for a few seconds. For our purpose here I disregard their testimony, which appears to be at odds with the radio traffic.

leading them to believe he had been holding his breath. Broad picked up some snow and placed it in his eyes; Weigel did not blink. After repeating that action and receiving no response, Broad checked Weigel's pulse and was unable to detect one.

At 8:00:51 A.M., ten minutes and nineteen seconds after Broad reported his vehicle had been rear-ended (at 82 mph), three minutes and two seconds after Henderson reported the situation diffused, and a few seconds after Weigel's feet were bound, Henderson returned to his vehicle and informed dispatch Weigel was in full cardiac arrest.

## II. Constitutional Violation

Unreasonable force claims are analyzed under the Fourth Amendment's objective reasonableness standard, *Graham v. Connor*, 490 U.S. 386, 395, 397 (1989), informed by the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation and quotations omitted). "Although [any] attempt to craft an easy-to-apply legal test in the Fourth Amendment context is

admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 127 S. Ct. at 1777-78.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The majority concedes Weigel was a safety risk from the time his vehicle collided with Broad's until he was handcuffed and his legs were bound. But, considering the facts in a light most favorable to Weigel, it says the Fourth Amendment was violated when "for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death." (Majority Op. at 17.) I disagree on all counts. On these facts, considered as the Supreme Court has instructed, no reasonable jury could conclude the force employed was unnecessary or that a reasonable trooper would be aware of a significant risk of death to Weigel.

The majority fails to appropriately consider the totality of the circumstances. It makes no allowance for the troopers' assessment of the amount

of force required, contrary to *Graham*, 490 U.S. at 396-97. It improperly assumes these troopers had sufficient notice of Weigel's alleged susceptibility to positional asphyxia. Finally, it overemphasizes the troopers' positional asphyxia training. The concurring opinion is inappropriately generous to the Estate in its summary judgment analysis, a matter I will discuss before moving to my disagreement with the majority opinion.

A. *The concurring opinion*

Judge Seymour says it was unreasonable for the troopers[7] to continue to apply force to Weigel's upper torso after his hands were cuffed and Stickley was sitting on his legs. On the other hand the concurring opinion says Weigel's constitutional rights were not violated before his legs were bound (because of his strength and past behavior). That said, it concluded a jury could find that "Broad applied pressure to Mr. Weigel's upper back for as much as three minutes after his feet were bound" and Stickley was lying across his legs. (Hartz, J. concurring.) The tipping point for this claimed constitutional violation is thus exquisitely fine, requiring a very exacting, although tedious, record review. Such a review is revealing.

---

[7] Actually only Trooper Broad. Henderson left to warm his hands and there is no claim of unreasonable force prior to his departure.

Winters, the person tying Weigel's feet, said they were never tied and the cord was around them (they were bound) for at most fifteen seconds. Specifically he testified:

Q. So what did you do?
A. His feet were planted on the ground, so I slid the plastic tubing under his legs, down around his ankles . . . it's plastic tubing. It is rigid. All you have to do is slide it under. Slide it under and started to cross the two to form a knot and that's when one of the officers indicated he had ceased breathing.

****

Q. [H]ow much time had elapsed from the time you put that plastic tubing under his legs until the time you heard the officers say he stopped breathing or something to that effect?
A. It could only [have] been a matter of ten or 15 seconds. The time it would take for somebody to slide something under, pull up the other side and by watching a clock, ***ten, ten, 15 seconds max.***

****

Q. . . . Did you ever get that plastic tubing tied?
A. ***Never did.*** Crossed the two ends, started to do that and that's when they said he had ceased breathing.

(R. Vol. III at 625-26 (emphasis added).)

Stickley, the man who was restraining Weigel's legs, testified as follows:

Q. When you described assisting the officers to cuff this gentleman, you said that you ended up laying across his legs and . . . trying to pull his arm over. Is that your testimony?
A. Yeah. I'm not exactly – I know I was at his legs at some point, because ***they wrapped the cable around his legs***.

****

Q. The cable. Do you recall how many times it was wrapped around [Weigel's] ankles?
A. No, I don't.
Q. Do you think it was more than once?
A. Yes.

****

-10-

Q.  How long after the rope was tied around his feet did this gentleman continue to struggle?
A.  ***Just a matter of seconds.***

(R. Vol. III at 647-48 (emphasis added).)

Similarly, Broad testified:

Q.  [W]hen [Winters] comes with the strap . . . what does he do with it?
A.  He just wraps it several times around his lower legs.
Q.  Do you know if he tied it in a knot or anything like that?
A.  I don't recall him tying it at all.  I think he just went around and around several times.

(R. Vol. II at 356-57.)

So, the three witnesses present on scene, including the one who actually attempted to tie Weigel's feet, unequivocally said Weigel's feet were never tied. If his feet were considered bound (by being wrapped instead of tied),[8] the length of time they were bound before he stopped breathing was at most fifteen seconds (and he was rolled over within a few seconds after he stopped breathing).

The only contrary evidence came from Henderson.  The concurrence correctly says Henderson initially testified Weigel's legs were tied before he left to tend to his hands.  But it doesn't account for his other testimony from the same deposition.  This is what he said:

A.  At that point I told Trooper Broad that I couldn't feel my hands, and that I was going to run to my car and grab my gloves.
Q.  Now, . . . are Mr. Weigel's legs tied together at this point?

_____

[8] Wrapped versus tied is not an insignificant point.  Weigel's demonstrated strength and combativeness suggests a mere wrapping of his feet would not be sufficient to incapacitate him.

-11-

A. **Yes**.

****

Q. So were his – this may be asked and answered. Were his feet tied together when you got up?
A. *I don't remember.  When I came back I noticed that they were tied.*

(R. Vol. II at 404, 406 (emphasis added).)

The concurrence thinks Henderson's equivocal testimony presents a factual issue–whether Weigel's feet were tied–sufficient to defeat qualified immunity and send this case to a jury.  Its conclusion about the length of time (three minutes) Weigel's feet were bound is even more tenuous.  It says "a jury could find that Trooper Broad applied pressure to Mr. Weigel's upper back for as much as three minutes after his feet were bound." (*Supra*.)  The only evidence to support that statement is a combination of Henderson's equivocal testimony (Weigel's feet were tied when he left for his car) and an inference drawn from the radio traffic suggesting the elapsed time between the situation stabilized report and the cardiac arrest report was three minutes and two seconds.[9]  The time inference is specifically refuted by two on scene witnesses who said Weigel stopped breathing at most fifteen seconds (Winters) or a few seconds (Stickley) after his feet were bound.  If that state of the record is sufficient to create a sufficient issue of fact to

---

[9] Assuming Henderson made the radio reports (he doesn't remember doing so) the elapsed time between them, three minutes and two seconds, included the time it took for him to walk from his patrol car to the scene (about twenty feet), the time it took for the troopers to determine whether Weigel was breathing (monitor him, roll him over, put snow in his eyes, etc.) and the time it took for Henderson to return to his vehicle and radio the cardiac arrest report.  The elapsed time had to be considerably less than three minutes.

-12-

defeat summary judgment this case represents a sea change in Rule 56 practice. Henderson's conflicting statements do not amount to a *genuine* issue of *material* fact, particularly when contrary to the statements of two participating witnesses. *See Scott,* 127 S. Ct. at 1776. "Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quotations omitted). "[M]etaphysical doubt as to the material facts" is not enough. *Id.*

The record supports no more than fifteen seconds of excessive force, if it actually was excessive. As a matter of law, that cannot be unreasonable. But ignoring the record and assuming Weigel's hands were cuffed and feet bound for nearly three minutes, the force used would still be reasonable under these circumstances.

B. *Totality of the circumstances*

The district court segmented this case into two discrete events: (1) the troopers' attempts to get Weigel under control culminating in a knock down, drag out fight (seven minutes) and (2) the actual restraint (three minutes). It then analyzed each segment separately. The majority does the same. But segmentation of facts and analysis is a form of "divide and conquer" decried in *United States v. Arvizu,* 534 U.S. 266, 274 (2002) ("The [circuit] court's evaluation and rejection of seven of the listed factors in isolation from each other

-13-

does not take into account the 'totality of the circumstances,' as our cases have understood that phrase.").[10]

The district court's approach makes no allowance for the troopers' high level of excitement and exhaustion. Expecting a rational and appropriate response in less than three minutes from one who has had virtually no time to recover from a violent, potentially life threatening struggle is itself unreasonable. It would have been folly for Broad to assume Weigel had given up the fight simply because his struggle waned[11] or to assume the restraints would be sufficient to prevent or contain another violent outburst if Weigel were rolled on his side or permitted to sit up. Prudence would demand a more cautious approach. Momentarily refusing to relinquish a hard won upper hand was not a mistake. If it were, it is excusable unless the troopers' conduct was

---

[10] *Arvizu*, a criminal case, was discussing reasonable suspicion analysis. Its totality of the circumstances discussion, however, would seem to be applicable here. *Garner*, 471 U.S. at 8.

[11] Even a casual observer of Middle Eastern politics recognizes that a "cease fire" seldom has anything to do with capitulation or willingness to negotiate; more often than not it is just a convenient ploy to rest and re-arm.

unreasonable.[12]  The troopers' conduct was not unreasonable considering all of the facts in this brief, violent and fast-paced episode.

One of the witnesses who responded to the troopers' calls for help testified the entire event was "very fast;" "it was just continual" and described the situation as "like a movie."  (R. Vol. III at 648-49.)  The troopers did not have the luxury of calm reflection.  In fact, Broad testified he did not think of using his pepper spray or baton because he "didn't have time to think about stuff like that . . ." and he "[n]ever had time" to consider calling for backup.  (R. Vol. II at 354, 359.)  He also stated he did not have time to evaluate Weigel's mental state because "[e]verything just happened too quickly . . . .  [F]rom the moment [Weigel] ran . . . from [Henderson] . . . to the time that he quit breathing he was just fighting.  We didn't have time to think about anything."  (R. Vol. II at 378.)  Henderson agreed.

_____

[12]  "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)."  *Graham*, 490 U.S. at 396; *see also L.A. County, Cal. v. Rettele*, --U.S.--, 127 S. Ct. 1989 (2007) (per curiam) (holding officers' actions in executing search warrant at a house objectively reasonable where officers ordered the residents (who were of a different race than the suspects and unclothed) out of their bed and held them at gun point for slightly more than two minutes before allowing them to dress; the officers, in the interest of their safety, acted reasonably in first securing the room and ensuring other persons were not nearby before allowing the residents to retrieve their clothes).

-15-

A global approach must also account for inherent danger. "In determining the reasonableness of the manner in which a seizure is effected, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott*, 127 S. Ct. at 1778 (quotations omitted). In doing so, we may consider the number of lives placed at risk, and by whom, as well as the relative culpability of the actors. *Id.* From my count, Weigel placed the troopers' lives in danger at least four times during the ten-minute encounter: (1) rear-ending Broad's vehicle at 82 mph; (2) running from Henderson across I-25 with two tractor-trailer trucks approaching; (3) almost pulling Henderson's gun from its holster; and (4) trying to get Broad's gun. He also endangered the lives of two members of the public, as well as his own. On the other hand, the troopers' acts were appropriately restrained; they did not kick Weigel, utilize their batons or pepper spray, or draw their weapons during the encounter. Rather, they (1) tended to Weigel's needs after his collision with Broad; (2) warned him of the approaching minivan; (3) called for an ambulance after he was hit by the minivan mirror; (4) placed their lives in danger by pushing him out of the way of oncoming traffic; (5) attempted to take him into custody, partially for his own safety, with basic wrestling moves and the use of restraint devices; and (6) never left Weigel unmonitored. The cost-benefit analysis clearly tips in favor of the troopers even though it resulted in Weigel's death.

-16-

Sometimes officers act too quickly or too aggressively, thereby creating an emergency rather than responding to one.[13]  Not here.  The danger to these troopers and possibly others was real and immediate, almost palpable; Weigel, alone, was the cause.

C.  *Officer perspective*

The majority makes no allowance for the troopers' assessment of the amount of force required or the need for caution in relaxing the force, contrary to *Graham,* 490 U.S. at 396-97.  It is easy in hindsight and from the serenity of a judge's chambers to conclude a hiatus in the struggle meant the danger had passed or the restraints in place were adequate; it is not so easy for the combatants, whose assessment we are required to respect.

We must consider whether the troopers engaged in the fight could reasonably conclude (respecting their assessment of the circumstances) Weigel

_____

[13]  The reasonableness of an officer's use of force depends not only on whether the officer was in danger at the precise moment he used force but also on whether the officer's prior reckless and deliberate conduct precipitated or exacerbated events, creating the need for such force.  *See, e.g., Jiron v. City of Lakewood*, 392 F.3d 410, 418 (10th Cir. 2004) (holding officer did not unreasonably create need to shoot armed victim by attempting to coax victim out of the bedroom instead of waiting for backup; "[h]ad [the officer] left [the victim] in the bedroom, she risked [,*inter alia,*] the escape of an armed and agitated suspect into the public . . . ."); *Medina*, 252 F.3d at 1132 (concluding officers did not unreasonably create need to shoot armed victim by following him and attempting to stop him rather than taking cover). "This approach is simply a specific application of the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard." *Medina*, 252 F.3d at 1132.  Here the troopers' acts were reactive, not provocative.  Weigel's unprovoked aggression cannot be excused and must not be minimized.

-17-

presented a risk sufficient to justify keeping him under control by continued restraint. Despite being restrained by both troopers and Stickley, Weigel was able to pinch Henderson's groin. And while Weigel agreed when Broad told him to "[s]top struggling because it wasn't doing him any good," he continued to struggle. (R. Vol. II at 327.) The facts do not suggest the fight was over or, more pertinent, a reasonable officer would think it was over.

Since Weigel continued to struggle while lying face down and restrained by the troopers and Stickley, it would be reasonable for the troopers to conclude he would resume the fight if turned on his side or sat up—positions from which he could fight more effectively, particularly before his legs were tied.[14] Indeed, as Henderson testified, once sat up, Weigel could have kicked or head-butted Broad or the witnesses. Add to that spitting and biting. Because it was uncertain whether Weigel would continue to resist, it was reasonable for Broad to keep him restrained face down for a couple minutes rather than take the risk. *See Rettele*, 127 S. Ct. at 1993 (considering the fact officers did not restrain residents any longer than necessary to secure their safety in concluding officers' actions were objectively reasonable); *Scott*, 127 S. Ct. at 1778 (because it was uncertain

---

[14] And it should not matter that Stickley was on Weigel's legs. Turning Weigel over or allowing him to sit before his feet were tied would change the status quo. Broad's safety assessment must be credited, if reasonable. Given the circumstances there is no reason for second guessing.

whether ceasing the pursuit of the suspect's vehicle would eliminate the risk, police were not required to "have taken that chance and hoped for the best").

Henderson was asked if Weigel was under control when he left to warm his hands. He said: "When I left to get my gloves, . . . he was still resisting." (R. Vol. II at 425.)[15] There was a follow-up question, "[W]as . . . there still a danger

---

[15] Every witness, including the troopers, testified Weigel continued to struggle (even after Henderson left the immediate scene) until he stopped breathing. However, a highway patrol investigator interviewed Henderson after the incident. According to the investigator's notes Henderson said Weigel quit struggling before he left to tend to his hands. Assuming the investigator accurately reported Henderson's unsworn statement it cannot be used against Broad and it is insufficient to defeat summary judgment against Henderson. *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment . . . . Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.") (quotations omitted).

The majority claims Henderson's unsworn statement is not hearsay because it constitutes an admission of a party opponent. *See* Fed. R. Evid. 801(d)(2) ("A statement is not hearsay if . . .[t]he statement is offered against a party and is . . . the party's own statement . . . .). While technically an admission by Henderson, the statement is little more than impeachment and therefore insufficient to establish a factual dispute. *See McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1312 (8th Cir. 1993).

The statement, if considered, is insufficient to defeat summary judgment in favor of Henderson. If, as the Estate argues, the district court concluded, and the majority holds, Henderson's departure to warm his hands is the defining event with respect to the issue of when Weigel was sufficiently under control to safely warrant moving him, then Henderson can hardly be responsible for unreasonable use of force during his absence.

In any event Henderson's statement cannot be used against Broad because it is not Broad's statement, nor one he adopted, and there is no evidence of a conspiracy or agency relationship. Fed. R. Evid. 801(d)(2); *see also Robinson v. Audi Nsu Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1487-89 (10th Cir. 1984).

to Mr. Weigel or Trooper Broad at that point?" (R. Vol. II at 425.) Henderson

answered, "Yes." (R. Vol. II at 425.) The questions continued:

> Q. Are you trained to leave a situation when someone is posing a
> threat to head butt or kick or get up and is a danger to those around
> him?
> A: I felt confident that the people that were there could control it
> because I felt that I was no use with my hands the way they were. I
> could not feel them and the one was bleeding all over.
> Q. You said that you felt confident that the situation could be
> controlled.
> A. I felt confident leaving Mr. Weigel in Trooper Broad's custody
> with all the witnesses standing around that were going to help us
> earlier, yes.

(R. Vol. II at 426.) Likewise Broad was asked, "When Trooper Henderson left to

go get his gloves, were you comfortable that you could retain control over Mr.

Weigel?" (R. Vol. II at 362.) Broad answered, "I assume so. I mean, he was still

struggling. But at that point I was keeping him down." (R. Vol. II at 362.)

In spite of that testimony the district court said, "[I]t is easily inferred that

Trooper Henderson would not have left Trooper Broad had he thought Weigel still

posed a credible threat to his safety." (R. Vol. III at 718.) I beg to differ. The

only thing to be reasonably inferred is that when Henderson went to his patrol

vehicle he concluded Weigel posed a manageable threat because (1) he was

handcuffed, (2) Stickley was on his legs, (3) other civilians were there to help,

and perhaps most important (4) with Weigel face down Broad was in control

because he could leverage restraint as might be necessary. Henderson's

assessment was one of continuing but tolerable danger if the status quo was

-20-

maintained. The status quo included Broad's ability to control Weigel because of the restraints in place. Had Weigel been moved to a position making it easier for him to resume the fight, Broad's control would have been compromised, increasing risk. Placing ourselves in the position of a reasonable officer on the scene, the record does not demonstrate a legitimate reason to quarrel with such an assessment. Certainly there is no reason for a court to concoct a contrary view.[16] *Scott*, 127 S. Ct. at 1779; *Graham*, 490 U.S. at 396-97.

D. *Apparent susceptibility to positional asphyxia*

Focus is critical. The issue is not whether the troopers failed to roll Weigel on his side resulting in his death due to positional asphyxia. The constitutional issue is reasonableness—whether (1) the circumstances gave the troopers sufficient time to reflect, (2) they unreasonably failed to recognize (in the short time available) Weigel was at risk for positional asphyxia, and (3) they properly

---

[16] The majority relies on *Sallenger v. Oakes* as suggesting Henderson's leaving the immediate scene demonstrates Weigel was under sufficient control, making it unnecessary for Broad to continue to hold him down. 473 F.3d 731 (7th Cir. 2007). In *Sallenger*, the Seventh Circuit concluded the fact one of three officers left the room to wash pepper spray from his eyes "raised a question of fact as to the degree of control [the other two officers] had over [Sallenger] after he was handcuffed. [The officer's] ability to leave the bedroom suggests that [the other two officers] had sufficient control over [Sallenger] at that time to render the [officers'] <u>additional punches and blows</u> unnecessary, and therefore, unreasonable." *Id.* at 740. *Sallenger* is inapposite. The reason Weigel was under control at the time Henderson left the scene was because Broad was in a commanding position. Therefore, unlike the punches and blows in *Sallenger* which were unnecessary to control Sallenger, Broad's restraining force was necessary.

-21-

responded to the recognizable risk (giving due consideration to the time available, the preceding and precipitating events, the danger presented and the available alternatives). None of the factors are present here. The troopers had insufficient time to reflect, the risk factors for positional asphyxia were not apparent and, had they been, the troopers' response was reasonable.

At bottom, it comes down to weighing the risk to Weigel against other factors—a non-exhaustive list would include the urgency of the situation, the risk to the troopers, the risk to others, the alternatives available, and the relative culpability of the actors. We can calmly reflect upon those matters, but the troopers had to do the cost-benefit analysis at lightning speed under adverse conditions. As *Graham* instructs, our reasonableness analysis must make allowance for the troopers' condition and perspective as they balanced the risk to themselves and others against the risk to Weigel.

Danger to Weigel looks at the risk of positional asphyxia presented by the methods employed. Medical and academic professionals disagree about whether applying weight to the back of a face down individual handcuffed behind his back is likely to cause asphyxia and death. The literature states sudden-in-custody deaths from positional asphyxia are "rare" and "infrequent" and when they do occur, certain risk factors are usually present: (1) obesity or protruded abdomen (beer belly), (2) enlarged heart or other underlying health problems, (3) mental illness, in particular, manic depression and extreme agitation, hallucinations and

-22-

paranoia, (4) drug and/or alcohol intoxication, (5) cocaine-induced bizarre behavior/excited delirium, and (6) a violent struggle with police. (R. Vol. I at 109, 124, 202.)

Both sides offered expert opinions as to whether Weigel had any of the risk factors. To the extent those opinions differ it is immaterial because the issue is not whether Weigel *actually* had the risk factors but whether the risk factors, if present, were or should have been apparent to the troopers during their fight with Weigel.[17] *Id*. at 1188.

With one exception none of the six risk factors were objectively apparent during the encounter. Weigel was not obese, did not have a protruded abdomen, and had no observable health conditions. There was no evidence which would

---

[17] The Estate's police practices expert, D.P. Van Blaricom, opined Weigel "clearly displayed the characteristics of a person at risk of restraint asphyxia" because "[h]e was engaged in bizarre behavior that is associated with diminished capacity," "[h]e engaged in a prolonged physical struggle . . . during which time he displayed abnormal strength," and "he continued to struggle until he suddenly quit breathing." (R. Vol. II at 290.) Defendants' expert, Dr. Vincent Di Maio, opined Weigel did not die from asphyxia but from Excited Delirium Syndrome (EDS) because, *inter alia*, Weigel demonstrated symptoms of a psychotic episode in the week preceding his death, Weigel failed to respond to resuscitation, and the facts of this case were consistent with EDS, which involves the sudden death of an individual, after an episode of excited delirium which is terminated by a violent struggle and use of physical restraint, in which the autopsy fails to reveal evidence of sufficient trauma or natural disease to explain the death.

The opinions were the result of an "after-the-fact" assessment as opposed to a participant's real time assessment. Indeed, during the encounter, Henderson and Broad could not have been aware of Weigel's prior psychotic episode, nor did they know he would not respond to resuscitation, what the results of his autopsy would be or that he would continue to struggle until he simply stopped breathing.

-23-

have reasonably led the troopers to believe he was mentally ill or in a state of drug-induced bizarre behavior/excited delirium, given that the troopers were otherwise engaged during this brief encounter. And while the troopers believed they detected the smell of alcohol on Weigel's breath, they observed no other signs of intoxication such as bloodshot or watery eyes, slurred speech or stumbling. Weigel's behavior after hitting Broad's vehicle would not have led the troopers (or any reasonable officer) to believe he was intoxicated, high on drugs or suffering from a mental illness or excited delirium—he was able to decline the need for an ambulance, answer the troopers' questions concerning the accident, agree to the administration of sobriety testing, follow Henderson to the side of I-25 and run across I-25.

The only apparent risk factor was the violent struggle. The literature on the subject and the Estate's police practices expert both acknowledge the struggle factor *may or may not* make an individual more vulnerable to positional asphyxia. Without more I do not see how something that "may or may not" be a factor can be apparent.

E. *Training*

In some detail the majority points to the positional asphyxia training the troopers received. It relies upon that training to conclude "a reasonable [trained] officer would have known that the pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death. His

-24-

apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation." (Majority Op. at 15.)

The training the troopers received did not establish that the brief use of the restraints employed presented a substantial risk to Weigel. They received materials and viewed presentations and videos pertaining to sudden in-custody death from positional asphyxia. Some of these materials informed them that an individual lying on his stomach has trouble breathing when pressure is applied to his back and they should get the suspect off his stomach and on to his side or in a seated position as soon as the suspect is handcuffed. However, other materials informed them to place the suspect in a position that allows him to breathe "as soon as safety permits" or "as much as possible, and AS SOON AS POSSIBLE, relieve the subject of heavy weight used for control" or "[a]s soon as possible, get person out of the prone position, on his/her side, or seated in upright position." (R. Vol. I at 197, 202.) As the troopers' use of force instructor testified, what "as soon as safety permits," "as soon as possible" and "as much as possible" mean is a judgment call dictated by the circumstances presented.

The troopers were trained not to misinterpret a suspect's struggle for oxygen as continued resistance. But the training materials concede it is very difficult to distinguish between the two and often the suspect will have no clear symptoms before he simply quits breathing. The troopers were also trained, consistent with the literature, that the presence of certain risk factors increases the

-25-

risk of sudden-in-custody death by positional asphyxia.  If multiple risk factors are present, the training materials recognize that whether officers can implement the recommended practices depends on the particular circumstances.[18]

Viewing the training materials as an integrated whole, they warn the troopers of the risk of sudden in-custody death from positional asphyxia–little risk to healthy adult males, some risk to the general population and greater risk to those with diminished capacity (identified by the presence of specific risk factors).  *See Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1188-89 (10th Cir. 2001).  Weigel was a healthy, adult male.  None of the risk factors with the exception of a violent struggle were apparent to the troopers.  Thus, to the extent training is relevant, the troopers acted consistently with it.[19]

---

[18]  In the training video referenced by the majority, the narrator, the Chief Medical Examiner for New York City, expressly acknowledges from the outset he has never had to subdue and restrain a violently struggling, emotionally disturbed individual.

[19]  I disagree that training has any relevancy in the qualified immunity analysis.  *See, e.g., Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision . . . unless that statute or regulation provides the basis for the provision sued upon."); *Tanberg v. Sholtis*, 401 F.3d 1151, 1159-60 (10th Cir. 2005) ("Even if it were clear that Officer Sholtis had violated the [Albuquerque Police Department standard operating procedures], that violation would not transform an arrest supported by probable cause into an unconstitutional seizure."); *Herring v. Keenan*, 218 F.3d 1171, 1180 (10th Cir. 2000) ("[W]ithout a stronger indication from the courts that a reasonable probation officer in Keenan's position would have known that she was violating Herring's constitutional rights by disclosing his HIV status, rather than simply violating an internal policy, we cannot say that

(continued...)

F. *Conclusion*

No constitutional violation occurred here. The troopers' actions were objectively reasonable under the totality of the circumstances and no reasonable jury could conclude otherwise. The troopers ought not be put to the expense and inconvenience of a trial.

III. Clearly Established Law

I am particularly concerned with the majority's cavalier treatment of clearly established law. It seems to incorporate concepts from tort law, which looks for a duty and imposes a standard of care. "'[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same–to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 53 (5th ed. 1984). Typically that standard of care is open ended–what a reasonable and prudent person would do under the same or similar circumstances. Myriad factors bear upon what might be expected of the hypothetical reasonable and prudent person. And juries are given wide latitude in sorting them out.

---

[19](...continued)
Keenan violated Herring's clearly established constitutional right to privacy.").

But qualified immunity in § 1983 cases narrows the focus.  It shields government actors from liability, even if they have violated a plaintiff's federal rights, unless those actors have fair warning, embodied in clearly established law, that their conduct violates established norms.  Cases from the Supreme Court and this Court establish or explain those norms and provide guidance in a concrete and particular way, stating useful principles capable of being easily understood and applied by those not well schooled in jurisprudence.  That guidance comes from the studied application of constitutional principles derived from a wide range of cases.  It ought not be scrapped in favor of ad hoc jury decisions guided only by abstract or theoretical formulations.  Stripping away qualified immunity reduces this case to a garden variety tort.

The district court determined the troopers were entitled to qualified immunity because the law prohibiting their conduct was not clearly established at the time of the incident.  In doing so, it compared the facts of this case with *Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183 (10th Cir. 2001).  Cruz, a person of obvious diminished capacity,[20] resisted arrest but did not start a fight or try to take the officers' weapons.  And, Cruz was subjected to the most extreme form of positional restraint—hog-tying.  Due to the substantial differences between *Cruz*

---

[20] To say Cruz's diminished capacity was obvious is an understatement.  He was running around naked outside of an apartment building, jumping up and down, kicking his legs in the air, yelling continuously about swarming insects, and swatting at invisible objects.  *Cruz*, 239 F.3d at 1186, 1189.

and this case, the district court concluded *Cruz* did not fairly warn the troopers that their actions here were unlawful.

Although the majority discusses *Cruz*, it ultimately ignores the case's impact on clearly established law by retreating to the highest level of generality, simply saying the Fourth Amendment prohibits unreasonable seizures.[21]  It relies on the troopers' training to conclude they should have been aware of the substantial risk of death to Weigel from the restraints employed.  Finally, it says cases from other circuits clearly established the law as it has today announced it— putting substantial pressure on a suspect's back while the suspect is in a face-down prone position after being subdued and/or incapacitated is excessive force.  I disagree with the majority's approach and all aspects of its reasoning.

The Fourth Amendment's general prohibition of unreasonable seizures does not provide fair warning of prohibited conduct.  *Cruz*, the only relevant case authority, cannot reasonably be read to contain such sweeping generalizations.  Instead it announces a limited holding, which the troopers clearly did not violate.  The majority's discussion of trooper training is irrelevant, but assuming,

---

[21] Apparently the reams of material interpreting and explaining the parameters of the Fourth Amendment's reasonableness requirement have been written in vain.  The rule from case law that warrantless searches must be based upon probable cause is of no moment.  Nor is the judicially created presumption that a search without a warrant is unreasonable.  Nor are the exceptions to that presumption.  Interesting.

*arguendo*, the contrary, the troopers did not stray from their teachings. Finally,

the mixed decisions from other courts provide no coherent guidance.

A. *The Fourth Amendment and Cruz v. City of Laramie, Wyo.*

> [O]ur analysis in this case of the constitutionality of the restraint of Mr.
> Weigel does not require us to compare the facts of *Cruz* to the allegations
> here. It is based on more general principles. The Fourth Amendment
> prohibits unreasonable seizures. We do not think it requires a court
> decision with identical facts to establish clearly that it is unreasonable to
> use deadly force when the force is totally unnecessary to restrain a suspect
> or to protect officers, the public, or the suspect himself.

(Majority Op. at 19.)

The Supreme Court sees it differently. In *Brosseau v. Haugen*, officer

Brosseau responded to a report of a fight between Haugen, Tamburello and

Atwood in a residential driveway. 543 U.S. 194 (2004). When Brosseau arrived,

Haugen ran and hid in the surrounding neighborhood. Brosseau called for

assistance; two officers responded. While they searched for Haugen, the officers

instructed Tamburello and Atwood to remain in Tamburello's vehicle which was

parked in the street in front of the driveway. They also directed Haugen's

girlfriend, who was present with her young daughter, to stay in her car parked in

the driveway. Haugen was eventually found and engaged Brosseau in a foot

pursuit. Haugen ran to the driveway and got into a parked Jeep. Brosseau

believed he was going to retrieve a weapon so she drew her weapon, pointed it at

Haugen and ordered him out of the Jeep. Despite repeated orders to leave the

vehicle and being struck with the butt and barrel of Brosseau's gun, Haugen

-30-

started the Jeep engine. As the Jeep began to move, Brosseau fired one shot through the rear of the driver's side window, hitting Haugen in the back.

The Court of Appeals concluded Brosseau was not entitled to qualified immunity because *Graham* and *Garner* clearly established the unlawfulness of her actions. *Id.* at 199. The Supreme Court reversed, holding the appellate court erred in relying on *Graham* and *Garner*:

> *Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality. Of course, in an obvious case, these standards can clearly establish the answer, even without a body of relevant case law. The present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision.
>
> We therefore turn to ask whether, at the time of Brosseau's actions, it was clearly established in [a] more particularized sense that she was violating Haugen's Fourth Amendment right . . . [in] the situation Brosseau confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight.

*Id.* at 199-200 (citations and quotations omitted).

This case cannot be distinguished from *Brosseau*. The appropriate use of positional restraints in a brief, violent situation endangering officers and others would seem to cry out for particularized warning no less than shooting "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200. Like *Brosseau*, this case does not present an obvious constitutional violation. The Fourth Amendment's general prohibition against unreasonable seizures is "cast at too

-31-

high a level of generality" to clearly establish the law. To strip these troopers of qualified immunity, the law must have been "clearly established in a more particularized sense" in December 2002.

The law at the time of the incident must have provided "fair warning" that the methods the troopers employed were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Fair warning comes primarily, but not exclusively, from the holdings in prior cases in the relevant jurisdiction. *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

No Supreme Court case is directly on point and the only relevant opinion from this circuit is *Cruz*. However, by its express terms *Cruz* applies only to hog-tying individuals with apparent diminished capacity. 239 F.3d at 1188. A hog-tie is a restraint technique whereby a person's hands are cuffed behind his back, his feet are bound together, drawn up behind his back and attached to the handcuffs. It results in his ankles being bound to his handcuffed wrists behind his back with twelve inches or less of separation. *Id*. A similar technique is referred to as hobbling. *Id*. at 1188 n.14. The only difference between the two techniques is the distance between ankles and handcuffed wrists; a separation of twelve inches or less is a hog-tie, a greater distance is a hobble. *Id*. The trial court in *Cruz*

found the distance to be twelve inches or less, a fact we credited and used to focus our analysis only on the hog-tie technique. *Id.* at 1188. We relied on literature and cases specifically dealing with hog-ties. *Id.* at 1188-89. And our decision reflected our narrow focus: "We do not reach the question whether *all hog-tie restraints* constitute a constitutional violation *per se*, but hold that officers may not apply this technique when an individual's diminished capacity is apparent." *Id.* at 1188 (emphasis added).

In *Cruz* we expressly did not forbid all hog-ties let alone the less restrictive hobble. Our discussion would lead any reader to think the distinction significant and the reach of the decision limited. It gives no warning that it should be read expansively to address lesser forms of positional restraint. This is not a hog-tie case; it is not even a hobble case. No attempt was made to pull Weigel's ankles behind him in any way, let alone tie them to his handcuffed wrists.

The majority relies on *Hope* for the proposition that a prior case need not address the very action in question in order to clearly establish the law. (Majority Op. at 19-20.) However, a prior case with fundamentally similar facts provides "especially strong support for a conclusion that the law is clearly established." *Hope*, 536 U.S. at 741.[22] It is significant that *Hope* dealt with punishment

---

[22] If the recent Supreme Court cases construing "clearly established Federal law" in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) context provide any indication, *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649 (2006); *Wright v. Van Patten*, -- U.S.--, 128 S.Ct. 743, 746 (2008) (per

(continued...)

imposed after the fact and after an opportunity for reflection.[23]  In such

circumstances guiding case law needs to be less specific; a higher degree of

abstraction may provide fair warning in a highly deliberative environment.  This

case is the polar opposite, involving dynamic decision-making under the most

difficult of circumstances.  To be useful to officers in the field (or in a fight) the

warning imparted must be crisp and clear; specific and simple.  A "spotted dog"

case provides that warning, generalized musings do not.  Three judges have

carefully read, even parsed, the language of *Cruz*.  With the luxury of time and

the benefit of briefing and argument from counsel, we take away dramatically

different views of its holding.  The troopers did not have that luxury, yet even in

---

[22](...continued)
curiam), something akin to on-point holdings is required.  *See House v. Hatch*,
527 F.3d 1010, 1015 (10th Cir. 2008)*; see also O'Brien v. DuBois*, 145 F.3d 16,
24 (1st Cir. 1998) (comparing the AEDPA and qualified immunity's clearly
established requirement and concluding "a rule need not be quite as clear or a
precedent as factually specific to rate review under the 'contrary to [clearly
established Federal law]' clause of [the AEDPA] as it must be to hold a state
actor liable for damages under [§] 1983"), *overruled on other grounds by
McCambridge v. Hall*, 303 F.3d 24 (1st Cir. 2002) (en banc).

[23] As punishment for failure to work, Hope was handcuffed to a hitching
post for seven hours, stripped of his shirt in the hot sun, deprived of water and
denied an opportunity to relieve himself.  The Supreme Court decided the
punishment violated the Eighth Amendment and then considered whether the
officers had fair warning the practice was prohibited.  The Court concluded it was
an obvious case:  "The obvious cruelty inherent in this practice should have
provided respondents with some notice that their alleged conduct violated Hope's
constitutional protection against cruel and unusual punishment.  Hope was treated
in a way antithetical to human dignity . . . .  *This wanton treatment was not done
of necessity*, but as punishment for prior conduct."  *Hope*, 536 U.S. at 745
(emphasis added).

-34-

the aftermath of a desperate fight they knew hog-tying was prohibited and did not do it or anything like it.  To expect them to have coaxed from *Cruz* anything akin to the majority's holding is contrived.

Even if a broader principle can be extracted from *Cruz* the majority's reading exceeds elastic limits.  A hog-tie may be a subset of positional restraint, but every form of positional restraint is not the equivalent of a hog-tie.[24]  The majority says the *Cruz* panel discussed the dangers of "sudden custody death syndrome," and "positional asphyxiation" in general, and made specific pronouncements on the risks.  (Majority Op. at 19.)  Not so.  *Cruz* said: "Given the extent of the case law, and the 'legally-related' literature available to law enforcement personnel detailing the serious dangers involved in application of the *hog-tie restraint*, it is apparent that officers should use much caution in applying the *hog-tie restraint*."  239 F.3d at 1189 (emphasis added).  *Cruz* only considered a very specific technique (hog-tie).  There was no generalized pronouncement on positional asphyxia, in fact the language of the opinion suggests limitation, not expansion.[25]  Enough about hog-ties.  *Cruz* contains an even more telling limitation: "Our holding today relates to individuals with an apparent and

---

[24]  A deductive syllogism (all men are mortal and Aristotle is a man; therefore, Aristotle is mortal) works where an inductive syllogism (Liz has red hair and she is female; therefore, all redheads are female) does not.

[25]  Had *Cruz* contained generalized statements about positional asphyxia they would be dicta.  Why should the law enforcement community be bound by a pronouncement no court is obligated to follow?

-35-

discernible diminished capacity."[26] *Cruz*, 239 F.3d at 1188.  We need to see if this case fits within that additional requirement.

Weigel was a strong, healthy, adult male.[27]  To the extent his capacity was diminished it was not apparent, *i.e.*, "readily understood; clear or obvious."  *See* n. 26.  The majority states Weigel's "apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation." (Majority Op. at 15.)  Weigel's behavior may have been bizarre as measured by ordinary interaction, but not for an individual attempting to avoid arrest by flight. When Weigel could not or would not produce his driver's license, the troopers reasonably believed there may have been a warrant for his arrest or he was driving with a suspended license.  That explanation for his behavior is at least as

---

[26] The *Cruz* opinion repeatedly said any diminished capacity must be apparent.  Breaking with that practice in this one quote the opinion rather inexplicably said "apparent and discernible." 'Apparent' means "readily seen; visible; readily understood; clear or obvious."  'Discernible' means "perceptible, as by the faculty of vision or the intellect."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, ONLINE EDITION (4th ed. 2000).  Something is discernible if it is merely capable of being seen (as upon close inspection), whereas something is apparent if it is obvious.  It may be discernible without being obvious, but it must be obvious to be apparent.  Since the language of *Cruz* requires the delirium to be both discernible and apparent, it must necessarily be apparent, because that is the more demanding standard (and that usage is consistent with the language used throughout the opinion).

[27] The *Cruz* record contained an expert opinion based upon a study concluding hog-tying does not result in positional asphyxia.  *Id.* at 1189. Significantly, we rejected the opinion because the study focused on healthy adult males.  *Id.*  If a study of healthy adult males is not relevant to those with risk factors for positional asphyxia, then those without apparent risk factors ought not be treated as if they were at risk.

cogent as the experts' theories and under the circumstances one far more likely to come to mind. While the troopers thought Weigel <u>may</u> have been intoxicated based on the smell of his breath (a factor calling for further investigation, rather than a jump to conclusions), they noticed no other signs of intoxication, let alone "severe" intoxication, as required by *Cruz*. 239 F.3d at 1188. The Estate's police practices expert agreed. Moreover, Weigel's behavior after hitting Broad's vehicle was inconsistent with an emotionally disturbed individual or one intoxicated on drugs or alcohol and there was no sign he was hallucinating or suffering from paranoia. He was lucid, understood the troopers and responded to their queries.

Candor requires an admission. Those sitting in a jury box years after the fact, might see events as the majority suggests, rather than as I see them. But that is not the test. The risk factors (to the extent they actually existed) must be considered as a reasonable trooper would have perceived <u>and processed</u> them at the time. Weigel's <u>possible</u> intoxication and <u>possible</u> suicidal ideation occurred before Weigel started the fight. For the three minutes following the fight when the violence had abated (according to the Estate) any reasonable but bruised, bleeding and exhausted officer would surely remember Weigel's strength and determination, a fight nearly lost, weapons nearly appropriated, the need to request help from onlookers, and the hoary face of death. Such an officer would surely be guided by the need to maintain control of a dangerous situation. Such

-37-

an officer would not (and ought not be required to) recall and evaluate a catalog of risk factors for positional asphyxia. The majority expects too much of these troopers. No jury should be called upon to speculate about such matters.

B. *Training*

Law enforcement officers must, like everyone else, obey the law and officer training is necessary to that end. At a minimum, instruction regarding behavioral standards imposed upon the police by a court decision in the relevant jurisdiction would be required because that is, by definition, clearly established law. Beyond that, training might include instruction on procedures or best practices, seeking to impart skills and guidelines useful to officers in effectively and safely performing their duties. The training may well reflect value judgments about matters beyond what established law requires. But the law dictates officer training, not the other way around.

Because training alone cannot establish the law, the troopers' training is largely irrelevant. The Supreme Court has used officer training in a limited way to underscore and personalize the fair warning requirement. *See Groh v. Ramirez*, 540 U.S. 551, 564 & n.7 (2004) (using officer's employer's internal guideline only to "underscore" that officer was on notice of the unlawfulness of his conduct not to "suggest that an official is deprived of qualified immunity whenever he violates an internal guideline"); *see also Hope*, 536 U.S. at 743-44 (relying on prison regulation placing requirements on the punitive use of hitching post in

-38-

determining law was clearly established).  Here, the troopers' conduct was well within the *Cruz* holding or any reasonable extension of it.  There was nothing for training to underscore.

These troopers were vaguely aware of *Cruz* but were not specifically instructed on its teachings because the Wyoming Highway Patrol already prohibited the hog-tie, decided by *Cruz*.[28]  The troopers' training was more than equal to *Cruz* standards.

_____

[28] The majority says *Cruz* "was apparently the reason for the extensive Wyoming Law Enforcement Agency (WLEA) training [the troopers received] on positional asphyxia."  (Majority Op. at  20.)  The record does not support the assertion.  Broad testified he was only "[v]aguely familiar" with *Cruz*, did not recall when he first learned of it and "couldn't even tell you what the point of it is.  I know basically we don't hogtie and I think that case has something to do with it."  (R. Vol. II at 366-67.)  The only testimony Henderson provided about *Cruz* was that he remembers Trooper Vincent (training officer) posting *Cruz* in the office.  He did not read it entirely and all he knew about it was it involved an in-custody death.  Trooper Vincent only testified concerning *Cruz's* effect on the training provided by the Wyoming Highway Patrol, not the WLEA.  He stated the Highway Patrol does not specifically instruct on positional asphyxia, that training comes from the WLEA.  Although a memorandum concerning *Cruz* was distributed state-wide from Highway Patrol's headquarters, Vincent did not specifically recall its contents other than that the Tenth Circuit found against the City of Laramie because its "officers were liable for causing positional asphyxia death, related death, of Mr. Cruz."  (*Id.* at 484.)  Vincent further testified that after *Cruz* was decided, the Highway Patrol spoke to him about it in reference to hog-tying.  However, because the Highway Patrol has always trained its officers not to hog-tie, Vincent said the Patrol's training did not change following *Cruz*.  None of this testimony establishes the majority's assertion that *Cruz* was apparently the reason for the troopers' training on positional asphyxia at the WLEA.  Indeed, the assertion is belied by the testimony of Ernest Johnson, who instructed officers on the use of force at the WLEA from 1976 through 2001.  He testified he began instructing on positional asphyxia sometime between 1996-1998, several years prior to the *Cruz* decision.

C. *Other jurisdictions*

*Cruz* is the seminal and solitary authority. Nevertheless, the majority relies on *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003), and *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), as clearly establishing the unlawfulness of the troopers' actions. Cases from other jurisdictions are relevant only if they are on point and collectively form what we might call the weight of authority. The cases miss the mark by a mile. *Gutierrez* suffers from the same flaw as *Cruz*–it is a hog-tie case. Gutierrez also had an apparent diminished capacity—he told one of the officers he had ingested bad cocaine and he had glassy eyes, slurred speech and walked unsteadily, all "classic symptoms of drug use." 139 F.3d at 448. The court also expressly distinguished the facts of the case—the transportation of Gutierrez in a patrol vehicle—from a "rapidly evolving encounter with a potentially armed suspect in which the officer must react quickly." *Id.* at 450.

*Champion* and *Drummond* cannot clearly establish the law because they were decided after the incident in this case. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding law must be clearly established at the time of the incident). To the extent the majority is relying on the holdings in these cases— that the law clearly prohibited putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being

subdued and/or incapacitated constitutes excessive force—its reliance is misplaced.

First, both cases relied on the officers' training. As explained above, an officer's training (beyond explaining clearly established law) is irrelevant to the analysis. Second, *Drummond* relied upon the obvious unreasonableness of the officers' actions–the officers allegedly crushed Drummond against the ground by placing their weight on his neck and torso and continuing to do so despite the fact his hands were cuffed behind his back, he was not resisting and he repeatedly cried out for air. The unreasonableness of the troopers' actions in this case (which I assume for argument only) was far from obvious. Finally, both *Champion* and *Drummond* relied on cases which are clearly distinguishable from the facts here.

Both cases relied on *Swans v. City of Lansing*, 65 F. Supp. 2d 625, 632-34 (W.D. Mich. 1998). Unlike Weigel, however, Swans suffered from multiple risk factors associated with sudden in-custody death from positional asphyxia, *i.e.*, he was 5'8" and weighed 260 pounds and officers knew he was mentally ill. Moreover, the case involved six officers placing their weight on Swans while his hands and legs were restrained, leaving him motionless in his cell for ten to twelve minutes and then moving him to a different cell—all due to the fact Swans said "no" in response to an officer's command and struck an officer's face with his foot upon being brought down.

Similarly, in *Simpson v. Hines*, relied upon by *Champion* and decided under the Fourteenth Amendment substantive due process standard, ten officers applied force to an inmate who refused to surrender contraband and left him handcuffed and motionless in his cell. 903 F.2d 400, 401-03 (5th Cir. 1990). Not only were the police officers' actions far more egregious and the inmate's actions calling for such force far less provocative than in this case, the cause of the inmate's death was unclear (*i.e.*, whether it was asphyxia due to a neckhold or asphyxia due to an officer sitting on his chest). Consequently, *Simpson* could not have provided the troopers fair warning that briefly applying pressure to the torso of a resisting but restrained individual is unconstitutional.

The other cases relied upon by either *Champion* or *Drummond* are also materially distinguishable from this case and therefore could not have provided the troopers' the requisite fair warning their actions in this case were objectively unreasonable. In *Johnson v. City of Cincinnati*, Johnson was obese, tested positive for marijuana and suffered from agitated delirium, all risk factors for positional asphyxia. 39 F. Supp. 2d 1013, 1017-18 (S.D. Ohio 1999). Moreover, although the court found there were questions of fact as to whether the city was liable for failure to adequately train, it noted there was a dispute between the parties' experts on the causes of sudden in-custody death and whether Johnson's death was in fact caused by the restraint used. And in *Estate of Bryant v. Buchanan*, Bryant was unconscious when the officers rolled him onto his

stomach, handcuffed him and placed their knees and weight on his chest. 883 F. Supp. 1222, 1224 (S.D. Ind. 1995). Weigel was not unconscious, he was resisting in a violent and persistent manner, the restraints were applied for at most three minutes and he was not moved from the locus of his attack on Henderson. The situation here was hardly under the control of the troopers.

In addition to the above cases being factually distinguishable, a number of other cases decided prior to December 2002 reached a different conclusion. For instance, in *Wagner v. Bay City, Tex.,* the plaintiff's brother, Gutierrez, was involved in an altercation with the police. 227 F.3d 316 (5th Cir. 2000). During the altercation, the officers sprayed him with pepper spray. The officers placed him face down on the ground and were eventually able to handcuff him. While doing so, one of the officers placed his knee on Gutierrez's neck or back. The officers then placed him in a patrol car face down and transported him to jail, where he was found not breathing. The district court denied summary judgment to the officers; the Fifth Circuit reversed, concluding the officers' conduct was "objectively reasonable in the context of th[e] dangerous situation that Gutierrez created . . . ." *Id.* at 324.

Similarly, in *Fernandez v. City of Cooper City*, Fernandez strenuously resisted the officers' attempts to subdue him and fled from them. 207 F. Supp. 2d 1371 (S.D. Fla. 2002). Once the officers caught up with him, Fernandez continued to actively resist being restrained. Eventually, the officers worked

together to hold him to the ground and cuff his hands and feet.  Shortly after they cuffed him, Fernandez stopped breathing.  The court concluded the officers did not use excessive force:

> The prone restraint, pressure on the upper torso (presumably from one of the officer's knees being pressed to [Fernandez's] back), handcuffing, and struggle were *all* the result of [Fernandez's] illegal, physical, and prolonged resistance.  It was of course an unfortunate occurrence, but sympathy for a plaintiff does not transform law enforcement officials' objectively reasonable responses to a volatile situation into a constitutional violation.

*Id.* at 1379; *see also Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 588-90, 593-94 (7th Cir. 1997) (finding no excessive force where police restrained obese individual, who had been acting strangely and had struggled with police, in a prone position with his hands and feet restrained and constantly monitored him even though he subsequently died of positional asphyxia); *Price v. County of San Diego*, 990 F. Supp. 1230, 1234-40 (S.D. Cal. 1998) (recognizing dispute between the experts concerning whether hog-tying leads to asphyxia and concluding officers used reasonable force in placing Price face-down, hog-tying him and applying pressure to his torso after he struggled with officers and tried to grab their guns).

The caselaw from other circuits was conflicting in December 2002.  There is no identifiable consensus, let alone a clear weight of authority.  They could not have provided fair warning to these troopers.  *Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir. 1992) (stating "the general state of confusion in the law . . . cast[s]

-44-

enough shadow on the area so that any unlawfulness in Defendant's actions was not [clearly established at the time of their actions]"); *cf. Musladin*, 127 S. Ct. at 654 (noting the wide divergence in how lower courts analyzed a certain issue demonstrated the lack of a Supreme Court case clearly establishing federal law in AEDPA case).

D.  *Conclusion*

The district court was correct with respect to the issue of clearly established law.  I would affirm on that issue.